**CITY OF ROMA, Appellant,**

v.

**STARR COUNTY et al., Appellees.**

No. 14608.

Court of Civil Appeals of Texas.

San Antonio.

April 3, 1968.

Rehearing Denied June 12, 1968.

Hill, King & McKeithan, Mission, Bill Ellis, Jr., McAllen, for appellant.

Lloyd, Lloyd, Dean & Ellzey, Alice, Luther E. Jones, Jr., Corpus Christi, F. R. Nye, Jr., Rio Grande City, for appellees.

CADENA, Justice.

Appellant, City of Roma, seeks to recover money allegedly owed to it by Starr County under a contract relating to the acquisition and operation by the County of the International Bridge which spans the Rio Grande between Ciudad Miguel Aleman, Mexico, and the City of Roma in Starr County. Named as defendants, in addition to appellee Starr County, were appellees, County Judge, County Commissioners, County Auditor and County Treasurer of Starr County. The City here complains of the action of the trial court in sustaining special exceptions to City's pleadings and, upon City's refusal to amend, entering judgment that City take nothing.

■ At the outset defendants insist that, since City filed no motion for new trial, we cannot consider City's points challenging the correctness of the trial court's rulings. In making this contention, defendants rely on the provisions of Rule 325, Texas Rules of Civil Procedure.

Rule 325 precludes consideration by appellate courts of complaints relating to rulings on motions for continuance, or for change of venue "or other preliminary motions made and filed in the progress of the cause," unless the claimed error was called to the attention of the trial court in a motion for new trial. It appears to be conceded that, but for Rule 325, a motion for new trial would not be a prerequisite to an appeal in this case. We must, therefore, determine whether an order sustaining special exceptions which assert defects of substance in the challenged pleading and decreeing that plaintiff take nothing falls within the category of rulings "on preliminary motions made and filed in the progress of the cause" which are not subject to appellate review in the absence of a motion for new trial. In this connection, we point out that we are considering the order that the City "take nothing" as the equivalent of an order dismissing City's suit with prejudice, which would appear to be the proper order where exceptions are sustained and plaintiff refuses to amend.

Our attention has been called to no case decided after the adoption of our current

rules of procedure in 1941 where a Texas Court directed its attention to the question of the necessity of a motion for new trial where the trial court sustains special exceptions to plaintiff's pleadings and dismisses the suit. However, a careful reading of Rule 325 convinces us that such action is not included within the classification of rulings on "preliminary motions," and that the City may complain of such action even in the absence of a motion for new trial where such motion is not otherwise required.

The language of Rule 325 falls into a familiar pattern. It consists of an enumeration wherein general words follow specific terms. The specific terms are "motion for continuance" and motions "for change of venue," followed by the general words "other preliminary motions." The specific words refer not only to preliminary motions, but to preliminary motions of a certain class. Neither a motion for continuance nor a motion for change of venue involves a determination of the question of the potential liability of the movant. The specific terms are descriptive of preliminary maneuvers which result in the entry of an order which is interlocutory, rather than final, in the sense that no appeal lies therefrom in the absence of special provisions authorizing an appeal seeking appellate review of such order prior to the rendition of a final judgment. In accordance with a well recognized canon of construction which, while it rests purely on form, has been frequently applied, in such a situation the general terms will be construed to embrace only things similar in nature to those enumerated by the preceding specific terms. 53 Tex.Jur.2d, Statutes, § 155, p. 221. In this way, effect is given to all the relevant terms. If we were to give the general language its natural meaning, it would include the things designated by the specific words, thus making the specific terms superfluous.

Where the trial court sustains a special exception which asserts defects of substance, the result, in the absence of a cura-tive amendment, is a dismissal of the cause of action and termination of the litigation. The resulting order of dismissal is a final judgment in the sense that it is immediately appealable. A special exception which contends that plaintiff's pleading does not assert a claim looks to the immediate termination of the litigation, and not merely to its suspension, abatement, transfer to another county, or postponement. Even if we accept defendants' contention that a special exception is a "preliminary motion," it is not a motion of the same class as a motion for continuance or a motion for change of venue. If the general language of Rule 325 is resricted to motions of the same class as those specifically enumerated, the Rule does not apply to a "preliminary" ruling which terminates the litigation. Cf. Enard v. Texas City, 368 S.W.2d 26 (Tex.Civ.App. —Waco 1963, writ dism'd), involving an appeal from an order granting a motion for summary judgment, and Carrera v. Texas Department of Public Safety, 387 S.W.2d 88 (Tex.Civ.App.—San Antonio 1965, no writ), relating to an appeal dismissing a suit for want of jurisdiction.

■ The nature of the dispute set out below is a summary of the allegations contained in the City's fourth amended original petition which, under well settled rules, we must accept as true in testing the sufficiency of such pleading.

Prior to 1960, that portion of the international bridge lying within the United States was owned and operated by a private corporation, the Starr County Bridge Company. Starr County asserted a right to buy the bridge, while the City of Roma claimed a prior right to purchase the property. Various lawsuits were filed involving the rights of the two political subdivisions to acquire the bridge, and the City of Roma enacted ordinances attempting to regulate the operation of the bridge by the bridge company and giving notice of the City's intention to acquire the bridge by exercise of the power of eminent domain. A portion of the bridge facilities was located on land owned by the City, and it was con-

templated that a new customs building would be erected on land belonging to the City.

The controversy between the County and the City was settled. The ultimate purpose of the settlement was to allow the County to use the proceeds of the sale of revenue bonds, authorized by Article 6795c, Vernon's Ann.Civ.St., to purchase the bridge facilities. According to the plan adopted, the following steps were to be taken: (1) The City, in exchange for land owned by the bridge company, was to convey to the company the land on which a portion of the bridge facilities is located, as well as land required as a site for the new customs building. (2) Underwriters assisting the County in issuing the proposed revenue bonds would acquire a controlling interest in the bridge company and operated until the revenue bonds were sold. These underwriters were to take all action necessary, on behalf of the bridge company, to carry out the terms of the agreement between the City and the County. (3) All litigation filed by the City and the County concerning the right to acquire the bridge was to be dismissed with prejudice. (4) The City was to repeal its ordinances attempting to control operation of the bridge and giving notice of the City's intention to acquire the bridge facilities by exercise of the power of eminent domain. (5) The City agreed to keep open, and in a reasonable state of repair, city streets providing accesss to the bridge. (6) The City agreed to furnish fire and police protection for the bridge properties located within the City and within two miles thereof, and to provide "police protection for all patrons of the bridge and the tolls collected by * * County while same remain on Bridge Property." (7) The revenues realized by the County from the operation of the bridge were to be deposited initially in a special Bridge Revenue Fund, in accordance with the provisions of the "trust indenture" evidencing the agreement between the County and the purchasers of the revenue bonds. These revenues were to be applied to the payment of current operating expenses, to the payment of principal and interest on the bonds, and to the creation and maintenance of special funds required by the provisions of the trust indenture. Any remaining monies, herein referred to as "net revenues," were to be transferred to an account in the County's general fund, designated as Revenue Fund, and 40% of such net revenues was to be paid annually to the City.

All suits involving the bridge property were dismissed; the City repealed the ordinance it had agreed to repeal; the bond underwriters acquired a controlling interest in the bridge company; the City conveyed to the bridge company the land it had agreed to convey, in exchange for land conveyed to the City by the bridge company; the new customs building was built on land conveyed to the bridge company by the City; and the County issued its revenue bonds, purchased the bridge facility, and assumed operation thereof on May 12, 1960.

Following an audit of the bridge operation for the period May 12, 1960, to September 30, 1960, the County paid to the City, under the terms of the agreement, the sum of $3,600.00, representing 40% of the net revenues realized from the operation of the bridge during such period. No further payments have been made to the City by the County, although, following the audit of the bridge operation for the period October 1, 1960, to September 30, 1961, the Commissioners Court of Starr County, on January 8, 1962, ordered the transfer of $10,000.00 in net revenues to the revenue fund, and directed the County Auditor and County Treasurer to pay 40% of that amount to the City of Roma.

Defendants' first special exception asserts that it is apparent from the face of that portion of City's pleadings seeking recovery under the contract "that the commissioners court of Starr County had no authority to bind said county to the performance of the claimed obligations sought

to be imposed on said county by said claimed agreements and that said claimed agreements could in no way be enforced as binding agreements against said county." In support of the ruling below to the effect that the commissioners court lacked authority to make the agreement in question, defendants present two theories which we now consider.

1. Defendants insist that the commissioners court had no authority to pay to the City of Roma 40% of the net revenues. It is contended that the enforcement of that promise would prevent commissioners court from exercising its discretion as to application of 40% of such net revenues and, to that extent, the agreement runs afoul of Section 3 of Article 6795c which provides that, after payment of certain expenses, remaining revenues may, in the discretion of commissioners court, be applied "to accomplish any of the purposes of this Act."

Section 1 of Article 6795c authorizes any county bordering on a river between the United States and Mexico to acquire any toll bridge or bridges. The first sentence of Section 2 empowers a county which acquires a toll bridge to maintain and operate the bridge. The second sentence, among other things, authorizes such county to do any and all things required, proper or necessary to the maintenance and operation of the bridge and recites that "to such end" the county "shall have power to make and enter into and to * * * perform any and all * * * contracts * * * required by the United States of America or the Republic of Mexico or any of their departments, officers, or governmental agencies, or the public authorities thereof."

Section 3 authorizes such county to enforce and collect tolls and fees for use of the bridge, with no free service until the bonds authorized by the statute, together with interest, have been paid and discharged. This section then provides that the tolls and charges shall be sufficient at all times to pay all expenses necessary for the maintenance and operation of such toll bridge; to pay the principal and interest of revenue bonds issued under the statute; to make all sinking fund and/or reserve fund payments agreed to be made in respect of such bonds and payable out of such revenues; and to fulfill the terms of any agreements made with the holders of such bonds. Out of the revenues received in excess of those required for the purposes above enumerated, the commissioners court may in its discretion establish a reasonable depreciation and emergency fund, or retire outstanding bonds, or apply such excess to accomplish any of the purposes of Article 6795c.

The agreement between the County and the City, dated April 30, 1960, in its preamble, recites that since the bridge facilities are located partly within the corporate limits of the City of Roma, the City can economically perform certain functions required for the successful operation of the toll bridge. After the provisions relating to the furnishing of fire and police protection by the City, there follows a statement to the effect that the parties specifically recognize that "the primary responsibility for the adequate fire" and police "protection and preservation of the bridge (constituting a part of the County road system) rests with the County, and that County is not relinquishing any of its governmental powers but is contracting with City to supply supplemental protection for such facilities." The same paragraph recites that the City employees engaged in furnishing fire and police protection shall act under the immediate supervision and direction of the County Sheriff and County Fire Marshall when such county officials are present.

■ The agreement reflects, therefore, that, in the judgment of county officials, certain things had to be done in order to insure successful operation and maintenance of the toll bridge. The agreement binds the City to perform certain services which, in the opinion of the county officials, the City could perform more economically

than could the County. We must assume that, in the judgment of the commissioners court, inducing the City to agree to render such services was one of the things, within the meaning of Section 2 of the statute, "required * * * proper or necessary to the maintenance an operation" of the toll bridge.

■ Under the clear language of Section 2, then, the County was authorized to contract with the City for rendition of the services which the City agreed to furnish. We do not agree with defendants' contention that the last clause of Section 2, which recites that "to such end and for such purposes" the County shall have power to enter into contracts required by the United States and the Republic of Mexico, limits the steps and actions which the County is authorized to take in providing for the maintenance and operation of the bridge facilities. Certainly, in order to operate the bridge, the County would have to hire employees, purchase electrical power and water, and provide for telephone service, among other things. Proper maintenance of the facility would require the purchase, *inter alia*, of asphalt or cement, paint, lumber and, perhaps, insurance. It is unreasonable to assume that the Legislature intended that, in doing what was necessary or proper for the operation and maintenance of the bridge, the County was restricted to dealing and contracting with the United States and the Republic of Mexico. Defendants' interpretation of the pertinent portion of Section 2 would require that we ignore the language empowering the County to do "any and all things" necessary or proper for operation and maintenance, and would have us read the second sentence of Section 2 as though it gave only the authority to execute contracts "required by the United States of America or the Republic of Mexico." Such a limitation on the power of the County would surely guarantee the unsuccessful operation of the bridge. The grant of authority to make contracts required by the United States or Mexico was obviously not intended as a limitation on the preceding broad and general grant of management power.

If the contract with the City was, in the judgment of the county commissioners, necessary for the operation and maintenance of the toll bridge, then the expense involved is clearly an "expense necessary for the maintenance and operation" thereof to the payment of which the County is expressly authorized to apply bridge revenues, by the language of Section 3(a) of the statute. Indeed, Sec. 3(a) requires that the toll fees be sufficient to pay such expenses.

We conclude that the County had authority to contract with the City for rendition of services necessary to the maintenance and operation of the bridge and to apply bridge revenue to the payment for such services. Such application of the net revenues is clearly authorized by Section 3(d) of the statute, which authorizes the application of such revenues to the accomplishment of any of the purposes of the statute.

■ 2. Defendants' second attack upon the contract presents a more serious problem. One of the provisions of the contract obligates the County to levy and collect charges and tolls which shall be sufficient to meet all of the obligations of the County under the trust indenture, and "in this connection County covenants to charge and collect charges and tolls which are sufficient to produce approximately the same net revenues or rate of return as now received from the operation" of the bridge facilities. This provision does not, as defendants contend, prevent the County from setting rates lower than those in effect on April 30, 1960, since, with an increase in business, a lower charge might well be sufficient to produce approximately the same net revenue or rate of return.

■ The restriction on the County's rate-making power is not invalid as an infringement on the County's right to operate a toll-free bridge. Under Sec. 3 of Art. 6795c, the County is without power to render free service as long as any of the revenue bonds

issued for the purpose of purchasing the bridge are outstanding. As long as any of such bonds are outstanding, the bridge must be operated as a toll bridge. The contract between the County and the City, by its express terms, will remain in effect only so long as the bridge is operated as a toll bridge. The obstacle to the rendition of free service is created by the enabling statute, not the contract. Whenever the statutory obstacle is removed by redemption of all outstanding bonds, the County is free to operate the facility as a toll-free bridge. If and when that happens, the City-County contract terminates by its own terms.

However, the contractual provision clearly requires that the tolls be sufficient to produce a minimum net revenue of approximately $10,000.00 a year. If the net revenues realized from the operation should fall substantially below that figure the County would be under a duty to increase the charges for the use of the bridge. It cannot be said, therefore, that the provision in question does not operate as a limitation upon the County's rate-making powers over and above the limitations contained in the statute.[1]

However, we agree with the City's contention that the provision in question, if invalid, does not render the entire contract unenforceable. The invalid provision is severable, and the remainder of the contract, if we excise such provision, presents a coherent, intelligible and enforceable agreement. While the County may be under no obligation to fix rates which will produce a minimum amount of net revenues, if the operation of the bridge does yield a "profit," the City of Rome is entitled to the payment provided for in the agreement.

Since the contract is valid and enforceable, the trial court erred in holding that the

pleadings seeking recovery thereunder fail to state a cause of action.

The judgment of the trial court is reversed and the cause is remanded for further proceedings.

---

[1]. The City of Roma does not, in this Court, urge that the provision in question may properly be construed as having the effect of guaranteeing a minimum payment equal to 40% of the net revenues being realized from the operation of the

bridge under the rates current at the time the agreement was made, with the payments due the City increasing proportionately if the amount of net revenues should increase. We, therefore, do not pass on this question.